With counsels who are going to argue this matter, please approach the podium and then state your names and the party you're representing and just keep in mind that the microphone is only for recording purposes, it doesn't amplify. Good morning, Your Honor. Glenn Camp, I'd like to petitioner James R. Carey as the executive of the estate of Alice K. Newman. Good morning, Your Honor. Sarah Weber on behalf of the appellees. Okay, great. Fifteen minutes, please. Your Honor, I'd like to petitioner James R. Carey as the executive of the estate of Alice  K. Newman. I don't know if that much will be needed, but that's recommended. Okay, all right. And then any time for rebuttal, yes or no? I will reserve two, three minutes for rebuttal. All right. Okay. That's all right. And this time. You may proceed. Good morning. May it please the Court. As I've just stated, my name is Glenn Cantor, and I represent the petitioner of this matter, James R. Carey, as the executor of the estate of Alice K. Newman. We're here today to request that this Honorable Court reverse the trial court's dismissal of petitioner's second amended complaint, and its conclusion that attorneys in the State of Illinois have no affirmative duty to determine whether a client has testamentary capacity before entering into an agreement to represent that individual or to. In your opinion, what duty of care was owed by Catton to Ms. Newman? Just the standard attorney-client duty or some special duty? Well, there's essentially two duties here. The one under the law in terms of our claim of professional malpractice, which is the attorney-client duty. And within that attorney-client duty, we maintain that Catton had a duty to first determine or as part of their representation of Alice to determine whether or not she actually had testamentary capacity.  Do you agree that a client is presumed to have testamentary capacity until proven otherwise? It's an absolute presumption that you can start with yes. But as our brief has argued, because there is a rule out there as to whether or not attorneys have duties to or what attorneys' duties are to clients with diminished capacity, that rule is nonsensical if an attorney doesn't first make a determination as to whether or not a client does have such capacity. Let me ask you a practical question. I believe it was Mr. Hartz that had the initial conversation with now the decedent, and then Ms. Creasy then had a subsequent conversation with her, right? I think there were several meetings and conversations between Mr. Hartz and the decedent. There were also, as alleged in our complaint, multiple conversations between Mr. Hartz and her son, Leonard, who reached out about this need to have this appointment. There was also a conversation between Mr. Hartz and Leonard, where Leonard said, hey, you've got to come tomorrow and sign this document. I want to focus on the conversation with Mr. Hartz and the decedent. How long did these conversations take place, and were they in person or via Zoom? I believe they were all in person, at least with the decedent. The only things that we alleged in our complaint that took place over the phone were conversations between Mr. Hartz and someone. Everything else took place at Catton's office, and I believe there were multiple visits to Catton's office. Okay, so like 15 minutes, 20 minutes, half hour, hour? The record doesn't reflect that, but these are not just, hi, how are you, nice to meet you, you know, a cocktail party. Well, I'm trying to do that. How can we expect Mr. Hartz to make an evaluation of someone's mental capacity, if it's only for a short duration of time? What was the extent of these encounters? Do we have Catton's billing records? They did not enroll at the appealing stage, so we didn't get to that point. We're not discovering that. Yeah, so we're not there yet, and as we argued at the trial court, and as I believe was in the briefs, we're kind of at a disadvantage here. We have, you know, Catton was in the meetings, we have, you know, the deceased, Alice, and then we have the ne'er-do-well brother, who, you know, is the only other person who has any understanding as to what happened. So, candidly, we don't know. We're at a little disadvantage also, because we don't have Mr. Hartz's deposition. It wasn't attached to the complaint now, it was attached to the prior pleas. Why wasn't it attached to the relevant Second Amendment complaint here? Your Honor, to be clear, that was not his deposition in this case, that was his deposition in the underlying probate case. And what happened was, you had this estate plan that took, they were in several meetings over the spring of 2017. They came to Catton's office, they mapped out some ideas for an estate plan, which I think one would make an assumption that these were not five-minute meetings. They had to have gone on for some period of time. So we don't know the extent of it. These are still facts that we're not aware of. Correct. And, again, taking the facts in the light most favorable to the plaintiff, as a non-moving party on the motion to dismiss, the court should have viewed them in the light most favorable to my client. And what about Ms. Creasy? Is there any indication of how long she had with the decedent here? There is no indication as to how long she met with them directly on May 31st, 2017, when the actual modification of the estate plan took place. Okay. However, that date is a key date, because while they may have, while Alice may have engaged Catton prior to that date, May 31st, 2017 is the date that the psychologist who, the psychiatrist who examined Alice determined that as of that date, she was suffering from dementia. Now, he can't pinpoint the exact date, but he can certainly pinpoint that as of that date, she was. That was a retrospective expert opinion. Absolutely. Now, mind you, that was also within the context of the earlier proceedings, and the guardian was appointed on June 9th. So we're not talking like, you know, months and months later. This happened immediately after this modification of the estate plan took place. And I think there is an assumption that can be made that this deteriorating condition is probably only in place prior to May 31st, but certainly by May 31st. All right. Just to follow up with Justice Walker's question, so what is a lawyer supposed to do here? Administer a test? Give her a psychological examination? I mean, you know, some attorneys are doctors, but, you know, attorneys are not doctors. Understood. So how, and they're not trained in this area, right? So how are we supposed to qualify what they're supposed to do? How do we determine whether they did what they were supposed to do? And, Your Honor, we're not asking for a right-blind test. You have to ask these four or five questions. We're just asking for an affirmative responsibility from the attorney to meet with a client, take in their condition, and come to their own formulation as to whether or not they do have a testamentary capacity. It's essentially no different than if a 15-year-old came into your office and you said, hmm, is this person 18s or 15s? Well, I've got to check before I do anything further. The same thing. If there's some reason to be concerned, or even if there isn't, you should at least have some confirmation in your mind that you're not dealing with a client with diminished capacity. Well, and so since there's no Illinois law, really, on this topic, you're asking for us to maybe make that law with respect to reconciling it with Rule 1.14 of the Attorney Code of Professional Conduct. That's correct, Your Honor. And curiously, well, not curiously, but the trial court said the same thing. In its order, in its ruling dismissing the second amended complaint, the trial court asked either this court or the Supreme Court to issue such a rule. So it wouldn't know how to proceed in this situation. But as to a specific rule on the books, the trial court neglected to find that attorneys do have this affirmative duty. And we're asking this honorable court to find that attorneys do have such an affirmative duty, even if it's just, you know, based on their own personal experiences and their questions of the clients. I understand that you attached a testimony or an affidavit of the doctor to your response to the motion to dismiss that, correct? I believe it was Kat who did it as part of the motion to dismiss. I've lost track, because there were multiple pleadings in this case. I've lost track as to when it was attached, but it was considered by the trial court, yes. All right, but this is a, you know, motion to dismiss based on the pleadings, so we shouldn't even consider that, right? Correct. And in our pleadings, we actually include what Dr. Shaw testified to. And again, taken in the light most fairful to the nominating party, the estate, the court should have given weight to those conclusions. So as your Honor has touched on, the, you know, key to the tool is 1.14. And that's the fact that lawyers do have an affirmative duty to clients with diminished capacity. And the question becomes, well, okay, how can we have a duty to clients with diminished capacity without first determining what is a client with diminished capacity? Is this a client with diminished capacity? So there has to be some inquiry, even if it's just an internal thought process in the attorney's mind. Defendant Hartz admitted he has no standard test for determining whether a client has capacity. And he also stated that he basically, you know, did nothing to evaluate whether Alice had capacity in this instance. And in doing so, the fact that we now have some proof that she was in a diminished state at some point during this process, he failed that duty. So do we know was it her choice or was it Leonard's choice to select Catton? Well, that's not specifically in the record. However, we do know in spring 2017, as alleged in our second medical complaint, it was Leonard who reached out to Defendant Hartz about modifying her multimillion-dollar estate plan. As alleged in our complaint, many of the modifications were A, unusual, and B, for Leonard's benefit. Now, if Catton did any digging here, they would have found out that Leonard was already subject to a Spendthrift trust. Now, I remember in law school learning about these things, and frankly, I didn't know they actually existed in the real world until I came across this case. It's a pretty unique situation we're dealing with. So there were enough reasons for Mr. Hartz's tenant to go up and say, hmm, something's not right here, maybe I should do a little digging. And curiously, as we alleged in our complaint, on May 30th, they had a conversation between Hartz and Leonard. And it was subject to, like, they're not even talking, he's not even talking to Alice. So the question becomes, who is Catton even representing in this action? It becomes very known, and whose interests are they even looking out for? Now, yeah. Has there been some limited discovery here? None. None. The only discovery, and which was argued at the trial court, which Catton argued should have been considered, was the significant discovery that took place in the probate matter. Now, we've put those allegations in our complaint, but considering we haven't gotten past the complaint stage, there's been no discovery taken. As I said, we're at a disadvantage, and we're left to just rely upon those documents. So the allegations in the Second Amendment complaint, are they all on information and belief, or are most of them based upon the discovery from the probate case? So it's a hybrid, Your Honor. There are a number of allegations that we plead on information and belief, based on how we, not we believe, but Dr. Shaw testified that Alice would have presented to third parties around this time. So we took his findings. We were in the room. We can't testify as to what happened. We can't, you know, we're not going to take defendant's word for it. Alice no longer around, and Leonard's an untrustworthy narrator, even to the extent he was there. So based on the findings of Dr. Shaw in his report, and how Alice would have presented, we plead those in our complaints. You know, we said, you know, in paragraph 14 and 15 of our complaints, Alice may have initially interpreted, or those interacting with Alice may have initially interpreted her condition as competent, because she could have, you know, she was well put together, you know, could actually, you know, speak intelligently. You know, basically, it's a copycat party, you know, conversation. But when it came down to, you know, getting into the nuts and bolts of, you know, what her estate was, any significant questions about her life, the world at large, Dr. Shaw testified that she couldn't do that. So, again, you know, if this was a meeting and passing at a cocktail party and the defense, hi, good to see you, she would have appeared great. But when you're sitting down to actually discuss her estate, her estate plan, which was modified, I think, six months prior, I think there would have been, and there were less, enough issues presented to the defendants, which would have put them on notice. And that was really where Judge Otto had his focus on the second amendment complaint, because there was no rule as to an attorney's duty to make the evaluation of the client. Essentially, whether or not they were on notice, that she had diminished capacity. And we've pled ample facts, especially when viewed in the light most favorable to the non-moving party, that they were on notice of this. And it's twofold. It's, one, the various ways she presented herself and the fact that, you know, something should have gone off. And, two, it's the many facts that we've pled about Leonard's influence over her. And an experienced attorney like Mr. Hartz should have said, hmm, something's amiss here, something doesn't add up. You know, it's one thing to say, hey, my mom's, you know, she's not great. She's not, you know, she's having trouble. But no, he's basically, you know, the puppet master here, pulling the strings. But these are your assumptions, right? I mean, we don't have anything to indicate that in the record, anywhere. Which assumptions are those? About Mr. Hartz should have been aware of this, should have been aware of that. I mean, we. . . If it recognized that Leonard was a puppet master. Yes. Admittedly, this is found information to believe. But when you look at the totality of the allegations, again, just from a pleading standpoint, we think that there is a case here that they should have known that something was amiss. Now, curiously, at the trial court, defendants, you know, went down this path of, you know, what's required for undue influence. And in doing so, they were trying to distract the court or dismiss the point completely. We're not raising a claim for undue influence. We're saying, you know, lower case U, lower case I, that Leonard was exerting influence over his mother for his own benefit. And that should have been sufficient to put counsel on notice that something was amiss. All right. Is there anything else at this point? No, Your Honor. You know, I'll just, you know, wrap up briefly. You have rebuttal, so. . . Okay. So, Your Honor, for those reasons, we would ask that this court reverse the dismissal of the Sacramento complaints. Okay, great. Thank you. Morning. Morning. Your Honors, in this case, cabin attorneys modified a will for Alice Newman, who was an elderly client. In the course of doing that, they met with her multiple times, including one-on-one. They observed her demeanor and presentation. They asked her questions. They discussed with her her investments and their value and her wishes for her estate. And based on that, they formed the impression that she had the capacity to modify her will and then modify it according to her wishes. And that's exactly what the law requires. I want to address one thing you discussed with Mr. Cantor, which is whether Mr. Hartz's deposition is part of the record that we can consider here. It is. And that's because the appellant attached that deposition to the first amended complaint. Realizing how bad it was for them, they dropped it from the second amended complaint but still rely on it extensively for the pieces they like within their complaint. In that situation, it does continue to be part of the record. And that's what we know about. But it was attached to the previous plea. Is that what you're saying? Yes, Your Honor. So not to this current plea. Not to the second amended complaint. Okay. Because references were made to it. Exactly. References to the parts that were helpful to their case are still in the second amended complaint. Your client noticed that her testamentary capacity was questionable based on when we look at the second amended complaint, it does allege unusual influence by Leonard. You would agree with that, right? When we look at the second amended complaint and its allegations. In a conclusory fashion, yes. It certainly alleges that. I don't believe there are facts that sufficiently allege that she was under any undue influence. He brought her to Captain's office. Right. She recently made large gifts to him. $660,000 over 7 months. Right. The fairly recent estate plan document said around 6 months prior alleging he had a gambling addiction and couldn't manage his own finances. Right. All of that is not inconsistent with a son taking care of his mother who may have some degree of diminished capacity. We don't know. That's not unusual. They don't even attempt to plead an actual case of undue influence. So you're saying they're not well-pled facts? Because I'm sure you agree we have to take all well-pled facts as true and interpret them as the light most favorable to the plaintiff. I agree with that. I don't believe they've pled all of the elements of an actual undue influence claim. They've certainly, as you say, suggested that, you know, Leonard was, you know, they suggest he was more involved than he should have been or in a way that, I think they say that something was awry. But something being awry isn't a claim for legal malpractice. It isn't a claim for undue influence. And it doesn't speak to testamentary capacity. Well, let's go with a hypothetical here. Let's just say for the sake of argument that the attorneys at Canton were on notice. Counsel is raising rule 1.14 So is 1.14 here applicable? And does it impose an obligation on the lawyers to take into account when they were dealing with her in terms of her capacity or lack of capacity? Yeah, so I want to be clear what they were on notice of. In your hypothetical, I think you're saying they were on notice of diminished capacity. Which in and of itself does not prevent someone from making a will. But I would agree that if they were on notice that she had diminished capacity, hypothetically, then they would certainly have an obligation to have sufficient discussions with her to ensure before they modify her will that she understood the natural objects of her bounty and had a plan for disposing of her estate and could express her wishes. That's what the case law requires. But right now we don't know if that was done, right? Because there are no depositions to indicate the extent of Mr. Hartz's conversations or interviews with Ms. Newton here? We do know from his deposition. But I think even aside from that, there have not been sufficient allegations that they were on notice of diminished capacity or potential lack of testamentary capacity. Right. But you don't have additional billing records, for example, for us to determine how long the lawyers met with Leonard and were his mother? That's right. I believe the information about the length of the meetings with Ms. Newman are not in the record. I don't think that's discussed in the deposition. How about the fact that Catton accepted Ms. Newman's check in July after knowing she was placed in guardianship and no inquiry was made as to her capacity then? Your Honor, I believe that the appellant has not continued to press that. That's part of the unjust enrichment cause of action that they have not argued on this appeal. But aside from that, that was a check for services rendered and they performed the services and I don't think at the time they were on any notice or aware of anything that would cause them to have to inquire further at that point. Going back to Rule 1.14, you would agree that it's part of the Code of Professional Conduct, it's part of the Supreme Court rules, and therefore has the force of law, just as the statute would, correct? Yes. So if there was an imposition of obligation here, we would be well suited to follow that rule if it's applicable here, correct? Yes, I think the problem with finding the duty that Mr. Cantor is looking for in Rule 1.14, I think there's a few problems with it. One is that that rule, although it discusses a situation where an attorney forms a reasonable belief that a client has diminished capacity and empowers them to take certain actions in those circumstances, it does not impose like an implicit test or anything like that. It's speaking to a situation where in the ordinary course of the attorney-client relationship one comes to form that belief. The other problem is that rule is not specific to probate situations, to estate planning. It applies to every lawyer and every client. If we were to impose a test for diminished capacity implicit in that rule, that would apply to all practice areas. It would be unworkable and I don't think that's what the rule intends. Okay, but that was something that we would need to explore, right? We just can't make that decision just based on at this stage of the litigation, right? Is Rule 1.14 applicable or not in this scenario? We don't know that yet because we don't know what conversations were had, what interviews were conducted, what was observed, what was determined. That's still beyond our grasp at this point in time because we don't have a record that provides us with that kind of information. I think we do know a lot of that from the deposition of Mr. Hartz, but we also have to look at what was alleged here. There's not allegations that Catton was on notice of diminished capacity or lack of testamentary capacity. All those allegations are either conclusory, just sort of parroting the standard, saying, for example, that she didn't know the objects of her bounty. That's not sufficient. Many of them were not contemporaneous with the actual meetings with Catton, and in fact the appellant... Well, the appellant actually conceded that in the motion to dismiss oral argument. They said there are no contemporaneous facts regarding what happened at the time of these meetings. We can also tell that a lot of them are frames such as she'd often struggle with word finding. That doesn't speak to how she presented on that day during those meetings and whether she actually gave any notice to Catton of whatever her capacity may have been. So all we know about how she presented on that day is Mr. Hartz's deposition, correct? Yes, that's all we know in the record, and the allegations... I don't mean to interrupt you. What about Ms. Creasy? I don't believe we have anything in the record with her speaking to those issues. Is there anything else? Yes, one other point I wanted to make. There's also evidence in the record from Dr. Shaw that appellants point to frequently, and much of his testimony actually contradicts the notion that Ms. Newman presented as having diminished capacity. He said things like she presented well, she had meticulous personal hygiene, she knew the value of her own home, she understood that she had a trust, she wished to divide her estate between her sons. These sound like in disho of someone who does have the capacity to modify their will. Okay. And what is your request here? If there's no further questions, we would request that you affirm the order of the hearing. Okay, good morning again, Your Honor. Good morning. You gave yourself two minutes. Yes, Your Honor, but I don't think I need more than that. Just a couple brief points on review. They say that our allegations are conclusory. Well, first of all, we have the admission by Mr. Hart that he has no standard practice for determining capacity, and he testified as to nothing that he specifically did in this case other than sit with Alice in the conference room. Now, they also point to the fact that, you know, the testimony of Dr. Shaw that goes against our case, and we didn't bury that. We put that right in our pleading that says, at first, she presents great, but if you're going to talk to her for a little while longer, Dr. Shaw said she's going to come, you know, unglue or unravel whatever, you know, phrase you want to use for that, that she's just not going to be able to maintain and put up this facade. And, you know, they say that we didn't allege any contemporary in these facts, and while that might be the case as to Mr. Hart's meetings, and it might be difficult for us to get in those shoes and get in the time machine to find out exactly what happened in those early May meetings, you have the testimony of Dr. Shaw, which says she's diminished on May 31st. Our pleading says that the same day that they met with Ms. Creasy in person, which, mind you, they didn't have an appointment, they showed up off the street, that should have put off major alarm bells as to what this emergency was, but on the day she was found to have diminished capacity, retroactively, that's when she actually modified the estate plan. So, for that reason, they were on notice. There was a basis for them to slow things down and make an actual inquiry, and for those reasons, we believe the trial court erred in, one, finding there is no duty, and, two, finding we did not state a claim. Any other questions? We ask that this court reverse the trial court's dismissal of our second amended complaint and remand it with some more instructions. Thank you. Thanks, Your Honors. Thank you, Constance, for a well-argued manner and for presenting us with a very interesting issue. This court will take it under advisement and we're going to take a short recess.